UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION
AT GREENEVILLE

| | | |
|---|---|---|
| JERRY "JK" WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| DONALD SEYFER and | ) | JURY DEMANDED |
| NATIONAL AUTOMOTIVE SERVICE | ) | |
| TASK FORCE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Comes the Plaintiff, Jerry "JK" Walker ("Walker" or "Plaintiff"), by and through the undersigned counsel, and sues the Defendants, Donald Seyfer ("Seyfer") and National Automotive Service Task Force ("NASTF") (collectively, "Defendants"), for compensatory and punitive damages, and for his claim, states as follows:

### I.  NATURE OF ACTION

1.      This is a diversity defamation action by Plaintiff, Jerry "JK" Walker, of Tennessee, against Defendant, Donald Seyfer, of Colorado, and his employer, National Automotive Service Task Force ("NASTF"), a District of Columbia non-profit organization, whose principal place of business is in Colorado.

2.      Walker is a locksmith and automotive technician, doing business as Mobile Automotive Diagnostics. Seyfer is the Executive Officer of NASTF, a trade organization originally tasked with facilitating the identification and correction of gaps

in the availability and accessibility of automotive service information, service training, diagnostic tools and equipment, and communications.

3. Walker and Seyfer are both actors in the automotive repair industry. They are also acquaintances, having met, spoken to, messaged, and otherwise communicated with each other about NASTF policies, Walker's NASTF membership renewal, and various repair issues, among other matters. In the past, Walker has been critical of Seyfer and certain NASTF policies, particularly NASTF's increasing efforts to exert control over who can have access to necessary repair information to make security-related automotive repairs.

4. Among such policies is the "Aftermarket Scan Tool Validation Program," announced by NASTF in March 2024. That particular program requires users, including locksmiths or auto technicians like Walker, to have specialized NASTF-sponsored credentials (*i.e.*, a Vehicle Security Professional ID or VSP ID) in order to perform specific security functions, such as add a key, all keys lost, immobilizer functions, and any other process that an automaker, *i.e.*, an Original Equipment Manufacturer ("OEM"), determines to be security-related.

5. Throughout 2024, Seyfer often attended automotive repair trade and training shows, expos, or meetings across the country. Walker regularly attended such events as well. By April 2024, when the Supplier & Training Expo ("STX") occurred in Nashville, Tennessee, Seyfer, present on behalf of NASTF,  appears to have become so exasperated by Walker's ongoing criticism of Seyfer's and NASTF's efforts to control

2

access to security-related repair information that Seyfer embarked on a premeditated smear campaign against Walker in an effort to undermine Walker's reputation, credibility, and character in the industry.

6.     At the Nashville event, which Walker was attending with scores of professional colleagues, Walker questioned Seyfer as Seyfer spoke to approximately 100-150 other attendees. Seyfer interrupted Walker, telling him and others that Walker cannot be trusted with information. Specifically, Seyfer stated:

> JK, I don't wanna have this discussion. You know why I don't wanna have it with you? Because I'm not gonna tell you how we fixed that. I will not tell you how to do it because *you've demonstrated you're not trustworthy with that information.*

7.     Seyfer's presentation was not only recorded, but audio and video of Seyfer's statement about Walker, made as 100-150 attendees looked on and listened, was published on April 24, 2024 on at least one social media platform, *i.e.*, Facebook, where others viewed and "Liked" and/or commented on the video. Nearly eight months later, the audio and video of the incident remains available for public viewing on Facebook.

8.     A few days later at a trade show in Milwaukee, Wisconsin, Seyfer, again representing NASTF, became so enraged at Walker, who was recording Seyfer's presentation on his cell phone, that he demanded Walker stop recording and "delete" the recording. Eventually, Seyfer himself ejected Walker from the otherwise public event.

9. In July 2024, NASTF not only denied Walker's renewal application to be a VSP after approving all of the documents Walker had submitted, but, under the pretext that an "audit" of Walker's account revealed too many policy violations to renew his membership, but also rejected his appeal because he refused to waive his legal rights. As Seyfer knew, denying Walker a VSP effectively prevented Walker from taking any job that required VSP credentials to make a repair. Later, at a locksmith convention in Texas in September 2024, Seyfer acknowledged that he, on behalf of NASTF, had shut down Walker's application, falsely telling the attendees that Walker had allegedly "threatened legal action." Seyfer then announced that he was "done" talking about it.

10. In fact, Walker had not "threatened legal action." Instead, Seyfer's comment was simply another attempt by Seyfer – who, at this point, appears intent to exact his form of "revenge" on Walker in his ongoing vendetta – to falsely and unfairly portray Walker as a "villain" and make him appear as the unreasonable one.

11. At the November 2024 SEMA (Specialty Equipment Market Association) and AAPEX (Automotive Aftermarket Products Expo) trade shows held in Las Vegas, Nevada, Seyfer, again representing NASTF, ratcheted up the smear campaign against Walker that he had started in Nashville seven months earlier. Speaking to a group of attendees, as prominent figures in the automotive repair industry lingered, Seyfer explicitly accused Walker not only of being dishonest and being a criminal, but of committing crimes professionally as a locksmith or automotive repair technician, stating that Walker *"steals software for a living."*

4

12.     By accusing Walker of being untrustworthy, dishonest, a criminal, and a thief in his profession, Seyfer slandered and defamed Walker, possibly irreparably injuring Walker's professional reputation. The statement that Walker *"steals software for a living"* was demonstrably false; as Seyfer knew or should have known, but it was also made by Seyfer – in his role as NASTF's Executive Officer – with malice. It was, after all, Seyfer's intent to undermine Walker's personal and professional reputation among industry participants to "push back" against Walker's criticism of NASTF and Seyfer.

13.     Seyfer's statement, made in his capacity as NASTF's Executive Officer, injured Walker personally and in his business and property. Seyfer's claim that Walker "steals software for a living" was further intended to perpetuate distrust in Walker, in Walker's business, and in Walker's software products.

## II.  PARTIES

14.     Plaintiff, Jerry "JK" Walker, was, at all times material hereto, a citizen and resident of Hamblen County, Tennessee.

15.     Defendant, Donald Seyfer, is a citizen and resident of Colorado, and at all relevant times, was the Executive Officer and Registered Agent for NASTF. He may be served with process at 4501 Harlan St., Wheat Ridge, CO 80033.

16.     The National Automotive Service Task Force ("NASTF") is a not-for-profit trade organization established in the District of Columbia in 2000 by automakers and the independent aftermarket to allegedly facilitate the identification and correction of gaps in the availability and accessibility of automotive service information, service

training, diagnostic tools and equipment, and communications. NASTF has its principal place of business in Wheat Ridge, Colorado, and may be served with process through its Registered Agent, Defendant Donald Seyfer, at 4501 Harlan St., Wheat Ridge, CO 80033.

## III.  JURISDICTION AND VENUE

### A.    Diversity Jurisdiction

17.    Defendant Seyfer is, upon information and belief, a citizen and resident of Jefferson County, Colorado. Defendant NASTF is a District of Columbia non-profit organization, with its principal place of business in Jefferson County, Colorado. The defamatory statement at issue in this case occurred in Las Vegas, Clark County, Nevada. Plaintiff Walker's injury was suffered in Morristown, Hamblen County, Tennessee, where he lives and conducts his locksmith and automotive repair business, Mobile Automotive Diagnostics. Other acts relevant to Plaintiff Walker's claims occurred in Nashville, Tennessee, Milwaukee, Wisconsin, and Austin, Texas.

18.    This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. §1332.

19.    The amount in controversy in this cause exceeds Seventy-Five Thousand Dollars ($75,000.00), as Plaintiff Walker has suffered significant, lasting, and indelible injury to his professional reputation and substantial financial losses, including lost income and/or lost existing and future customers and business opportunities. Among other injuries to Walker, Seyfer's statements have:

6

# Undermined client confidence in Walker's integrity and the quality of his products and services;

# Negatively affected revenue streams from tool and software sales for Walker;

# Led to a significant decline in paid training engagements for Walker; and

# Deterred potential partners from engaging in future projects with Walker.

20.     The image of Walker painted by Seyfer – that Walker is a untrustworthy, a thief, a criminal, and a felon – gave a lasting false impression of Walker's professional reputation to his professional colleagues, causing Walker to suffer an enduring injury to his good name and business that may take him years or a lifetime to fully restore. Seyfer's statement that Walker "steals software for a living" also appears to have been intended to impair future financial investments in Walker's ECUhero software, as potential customers are likely not to invest in allegedly stolen software.

21.     As a consequence of Seyfer's libelous, slanderous, or otherwise defamatory statements, Walker has also suffered mental anguish, emotional distress, public humiliation, shame, loss of enjoyment of life, depression, anxiety, loss of appetite and energy, and sleep disturbance.

22.     Seyfer's defamatory statements about Walker were also made with malice, as Seyfer knew, or should have known, or recklessly disregarded the truth, that

his statements were false, yet made the statements nonetheless, intending to injure Walker's business reputation and livelihood, making Seyfer and NASTF liable for punitive damages.

23.     The amount in controversy exceeds the $75,000 jurisdictional threshold.

B.      Venue

24.     Venue is proper in the Court pursuant to 28 U.S.C. § 1391(b)(2).

C.      Seyfor and NASTF's Tennessee Contacts

25.     NASTF offers paid credentialing services, such as the Secure Data Release Model ("SDRM") program, to automotive professionals in Tennessee.

26.     NASTF's Vehicle Security Professional Registry, part of the SDRM, includes hundreds, if not thousands, of members from Tennessee, indicating NASTF's direct engagement with professionals in the state.

27.     NASTF has targeted almost every locksmith and auto technician who resides in or does business in the State of Tennessee for membership. Currently, NASTF has hundreds, if not thousands,  of Tennessee locksmiths or auto techs on its membership rolls, collecting hundreds of dollars in fees from members and mandating strict compliance with its self-written requirements for Tennessee locksmiths, auto technicians, and other service professionals to conduct their business here. Beginning in March 2024, NASTF has begun warning Tennessee locksmiths, auto techs, and other service professionals that if they do not become NASTF VSPs, pay the $425 in

8

application fees, and secure $1 million in general liability coverage, those non-member service professionals will be barred from performing security related repairs that they have previously performed without NASTF's intervention.

28.     To accomplish exclusionary scheme, NASTF has entered into agreements with more than a dozen automakers who, combined, have more than 2.3 million vehicles in operation in the State of Tennessee as of 2022. Anytime a security-related repair is performed by an independent locksmith or auto tech on one of those vehicles, NASTF necessarily plays a significant and necessary role in that repair. No such security-related repairs can be performed absent NASTF VSP credentials.

29.     On any given day, if a security-related repair is being performed in Tennessee by a locksmith or auto technician, more likely than not, NASTF is directly or indirectly involved in the repair.

30.     One automaker with whom NASTF partners is Nissan North America, Inc., whose United States headquarters is based in Smyrna, Tennessee, where it has manufactured 15 million cars and has 5,700 employees.

31.     NASTF has also conducted business within Tennessee, including holding public general meetings and board of directors meetings in the state. For instance, this past year, NASTF held its Spring General Meeting on April 24, 2024, at the Gaylord Opryland Resort & Convention Center in Nashville, Tennessee. NASTF has also held board meetings during the 2024 Equipment and Tools Institute ("ETI") Winter Tech Week event in Smyrna, Tennessee, from December 9-11, 2024.

9

32. In fact, it was at the 2024 Supplier & Training Expo ("STX") held in Nashville, Tennessee, from April 24-28, 2024, that Seyfer defamed Walker during a presentation made before 100-150 attendees in his role as NASTF Executive Officer. Seyfer explicitly stated that Walker was "not trustworthy" as a group of 100-150 attendees looked on and listed, a statement that proved to be the genesis of Seyfer's months-long smear campaign against Walker.

## IV. FACTS

### A. Plaintiff's Business

33. Plaintiff, Jerry "JK" Walker, is the sole proprietor, owner, and operator of Mobile Automotive Diagnostics, a locksmith and automotive repair business located in Morristown, Hamblen County, Tennessee. A substantial part of Walker's business has long included making security-related repairs to automobiles. Another part of Walker's business involves the development and sale of automotive software (ECUHero) that provides solutions for programming new and used modules in Fiat and Chrysler automobiles.

34. Walker has spent his professional life building a positive reputation as a mobile automotive diagnostician. He attends trade shows and training events and has also taught other locksmiths and/or auto technicians at industry-sponsored events. At Seyfer's request, Walker also participated as an expert panelist during a segment on remote programming at the 2022 NASTF Fall General Meeting.

10

B.    Seyfer and NASTF Background

35.    Defendant, Donald Seyfer, is the Executive Officer of the Defendant, National Automotive Service Task Force ("NASTF"), an organization founded to identify and resolve gaps in the availability of automotive service information, training, diagnostic tools, and equipment.

36.    In theory, NASTF acts as a conduit between automakers, OEMs, and automotive repair technicians by ensuring locksmiths and auto techs have access to necessary information to make repairs, including security-related repairs.

37.    NASTF manages the Secure Data Release Model ("SDRM"), providing credentials to locksmiths and technicians who require access to security-related automotive repair information and systems from automakers and other OEMs. The SDRM enables locksmiths and technicians to perform  security-related services such as programming keys, purchasing key and immobilizer codes from automaker websites and immobilizer resets. For all practical purposes, SDRM is a tooling lockdown by OEMs, developed as a means to limit non-dealership access.

38.    In March 2024, NASTF began implementing a new program, the "Aftermarket Scan Tool Validation Program." This program targets independent locksmiths and auto techs, essentially requiring them to become dues-paying members of NASTF in order to obtain credentials to access security-related automotive functions like key programming in already owned and activated scan tools. The program is controversial, as it forces locksmiths and auto techs who need access to security-related

11

repair information to pay $425.00 bi-yearly for a membership, obtain $1,000,000 in general liability insurance, obtain "dishonesty" insurance for subordinates, and agree to abide by NASTF's rigid written "Terms and Conditions."

### C. Plaintiff's Criticism of NASTF and Seyfer

39. Walker had been a member of NASTF. Before and after NASTF announced its new policy in March 2024, Walker had utilized social media to offer constructive criticism and solutions to various security-related repair issues. Walker also communicated directly with Seyfer regarding such issues.

40. Walker, who had been a NASTF member as both an Air Security Technician and Vehicle Security Professional ("VSP"), pulled no punches with his criticism of NASTF efforts to exert complete control over that segment of the automotive repair industry – locksmiths, auto techs, and/or mechanics – that required access to necessary security-related automotive information and systems from automakers, *i.e.*, Key Codes, Immobilizer Codes, and Scan Tool Validation, to perform their jobs.

41. In one particularly critical social media post on March 16, 2024, a few days after NASTF announced its "Aftermarket Scan Tool Validation Program" adopting new requirements for locksmiths and auto techs to obtain a VSP ID for security-related processes, Walker posted a meme – a photo of the Branch Davidian compound in Waco, Texas, with a photo-shopped image of a NASTF sign in front of the compound, with the caption, "it's not about 'security' it's about control." Seyfer texted Walker: "Associating us with Waco was wildly inappropriate."

42.     Walker frequently attends industry trade expos and conferences across the country. NASTF routinely has a presence at these events, with various presenters, including Seyfer, giving industry and program updates, followed by question and answer sessions. It has become Walker's practice to make audio and/or video recordings of some of these presentations using his cell phone. Seyfer, aware of Walker's practice of recording presentations, has halted his presentation and not only demanded that Walker stop recording, but that he also "delete" anything recorded.

D.     Seyfer's Smear Campaign Against Plaintiff

1.     The April 2024 STX Expo in Nashville

43.     At the automotive industry's most comprehensive training event, the 2024 Supplier & Training Expo ("STX"), held at the Gaylord Opryland Hotel in Nashville, Tennessee, from April 24-28, 2024, NASTF held its Fall General Meeting. On or about the morning of April 24, 2024, Seyfer was making a presentation to between 100-150 attendees at that meeting. During the Q&A segment that followed the presentation, Walker asked Seyfer a question about the security of proposed transactions. Seyfer interrupted Walker's question and made the following statement:

> "JK, I don't wanna have this discussion. You know why I don't wanna have it with you? Because I'm not gonna tell you how we fixed that. I will not tell you how to do it because *you've demonstrated you're not trustworthy with that information.*"

44.     When Walker tried to defend himself and asked Seyfer to explain his statement to the attendees who had heard the remark, Seyfer simply refused to respond.

13

45.     On April 25, 2024, an audio-video recording of Seyfer's remarks, including his interaction with Walker and his statement that Walker was "untrustworthy" was published on the Facebook page of a Tennessee locksmith, Stephan Eric Lambert (https://www.facebook.com/stephan.lambert.5) who, upon information and belief, is a NASTF VSP. The recording is 2:56:18 long.

46.     The pertinent interaction between Seyfer and Walker begins at about the 2:50:19 mark, as Walker, who is not seen on the video, begins to speak. At about the 2:50:39 mark on the recording, Seyfer, who is seen sitting on the dais behind the speaker's lectern, begins to speak and seconds later, utters the statement recited verbatim above.

47.     Thus far, multiple Facebook subscribers have "Liked" the post, hundreds of others have viewed it. As of 8:35 p.m. on December 18, 2024, the video, with audio, remains posted on Lambert's public Facebook account for anyone to view.

2.      The April-May 2024 AKG Trade Show in Milwaukee

48.     At another event hosted by Key Innovations and UHS Hardware in Milwaukee, Wisconsin, from April 30-May 3, 2024, Seyfer attempted to have Walker barred from attending by asking staff of the Automotive Keys Group ("AKG") to keep Walker out of an otherwise public meeting.[1] Seyfer then became enraged when he saw

---

[1] AKG had previously hired Walker to teach training sessions at events all over the country. Walker not only earned between $2000-$3000 for each one of these training events, but he also received exposure for his business, Mobile Automotive Diagnostics. In seven months since the April AKG event in Milwaukee, Walker has not received an invitation from AKG to teach a training session.

14

Walker recording the meeting and demanded that Walker "delete" the recording, telling him, "you do not get to record my stuff." Seyfer ultimately ejected Walker from the meeting room and announced to the crowd that the meeting was over.

### 3. Denial of Plaintiff's Renewal Application

49. Two months later, on July 15, 2024, Walker submitted an application to renew his membership and obtain a VSP ID in order to access the SDRM Registry and perform specific security functions, including: add a key, all keys lost, immobilizer functions, and any other process that the OEMs determine to be security-related. Later that same day, NASTF "support" emailed Walker to advise him that "[a]ll documents on the account are approved" and that his application was merely awaiting completion of a "background check."

50. Later that same evening, at 9:09 p.m., Walker received another email from NASTF "support" (likely Seyfer). This time, the email indicated the documents were *not* approved.

51. As soon as he received notice that his application had been denied, Walker attempted to cure the alleged deficiencies, providing NASTF with additional documents and information and inquiring about what else he needed to do to have his application approved.

52. The next day, Walker received an email from the NASTF "registry manager" indicating that the account had been audited and stating Walker's application had been denied for past policy violations. The two alleged violations where for failure to provide customer documents on 12/09/2021 and again on 04/27/2023.

53. Upon receiving notice of the audit, the Walker submitted the alleged missing customer documents, along with a brief explanation.

54. The following day, at 9:58 p.m., Walker received another email, this one stating that the documents had been received, but encouraging Walker to submit an "officially response," which was subsequently determined to be an appeal process.

55. Walker then referenced a previous text message conversation with Seyfer on March 18, 2024, in which Seyfer had stated, "the audit process is designed to ensure violations are resolved or that we understand the business model and support it." During this exchange, Walker asked Seyfer about the potential outcome if he were to have fifty (50) transactions without proper documentation. Seyfer stated, "an audit with the explanation of the issue and you agreeing to follow policy if you wish to remain in the program." Naturally, Walker interpreted this to mean that he would have an opportunity to cure any deficiencies if the need ever arose. This turned out to not be the case.

56. Despite Walker's good faith efforts to cure the deficiencies, NASTF simply advised him of his right to appeal. Undeterred, Walker appealed. NASTF denied his appeal, not because of the alleged "policy violations," but because Walker would not waive his legal rights to prosecute the appeal.

57. In September 2024, at a locksmith convention in Texas, Walker again questioned Seyfer about the audit process, pointing out that what he had experienced during that process was not at all what Seyfer had promised in his text messages, *i.e.*, a process whereby an applicant could actually work with NASTF to re-gain compliance.

16

Seyfer conceded that NASTF's audit of Walker's transactions was not what Seyfer had promised. Seyfer claimed that this was because Walker had allegedly "threatened legal action." Seyfer bluntly told attendees that he was 'done" talking to Walker about it.

        4.     The November 2024 SEMA/AAPEX Shows in Las Vegas

58. Finally, in November 2024, Las Vegas hosted the SEMA (Specialty Equipment Market Association) and AAPEX (Automotive Aftermarket Products Expo) Shows in conjunction with one another. These two shows bring well over 100,000 industry professionals and 60,000 domestic and international buyers together. NASTF held its Fall General Meeting during this event.

59. Immediately following that meeting, Seyfer, representing NASTF, was engaged in conversation with a group of attendees. In a room that had been packed moments earlier, where prominent figures in the automotive industry still lingered, included a NASTF software developer, Seyfer stated that Walker *"steals software for a living."*

60. Seyfer's statement was made despite the fact he knew it was false. Alternatively, he made the statement with reckless disregard of its truth or falsity. Seyfer's disregard for the truth is made even worse because his statement was made to an audience of Walker's professional colleagues and by the Executive Officer of NASTF, an organization that increasingly exerts enormous control over certain segments of the automotive repair industry.

61. As someone in the same trade and industry as Walker, Seyfer also knew that his statements implying that Walker was dishonest and a criminal, and accusing Walker of being a thief, who "steals software for a living," would be harmful to Walker's character and/or reputation and business.

### 5. Plaintiff's November 2024 Cease and Desist Letter

62. On November 2024, having seen and heard Seyfer make these and other various statements to smear his reputation, Walker retained an attorney and demanded, in writing, that Seyfer cease and desist making such false and malicious statements. [Exhibit 1]. Seyfer was served with the cease-and-desist on November 24, 2024, at 5:23 p.m. Predictably, Seyfer has never responded to that written demand.

### E. Seyfer's Defamatory Statement Injured Plaintiff.

63. Seyfer's defamatory statements have significantly damaged Walker's professional reputation as a software developer, automotive technician, and as an industry trainer. Walker has not only lost income or existing and future customers and business opportunities, but has suffered mental anguish, emotional distress, public humiliation, shame, loss of enjoyment of life, depression, anxiety, loss of appetite and energy, and sleep disturbance.

64. The severity of Seyfer's defamation of Walker was heightened because Seyfer made the statements maliciously and to cause injury to Walker and did so at industry trade shows, as Walker's professional colleagues looked on and listened. The image painted by Seyfer – that Walker is untrustworthy, a thief, and a criminal – gave

18

a lasting false impression of Walker's professional reputation, causing Walker to suffer an enduring and indelible injury to his good name that may take him years or even a lifetime to fully restore.

65.     Seyfer's statements that Walker is "untrustworthy" and that he "steals software for a living" not only foster distrust in Walker's business and software product (ECUHero), but they also impair future investments in Walker's software, as potential customers are likely not to invest in allegedly stolen software. This came on the heels of Walker's announcement of a ground-breaking software innovation.

66.     Seyfer's defamation has also had a profound impact on Walker's personal and family life. The time, energy, and resources that Walker has been forced to dedicate to repairing his image, addressing Seyfer's false and defamatory accusations, and mitigating their consequences, have taken a significant toll on Walker's familial responsibilities. Seyfer's actions have compelled Walker to abandon his spousal and paternal duties, *e.g.*, by having to focus on repairing the injuries Seyfer wantonly inflicted on Walker's reputation and credibility within the industry. This emotional and mental anguish has inevitably disrupted Walker's ability to be present for his loved ones, causing undue stress and hardship on Walker and his family.

67.     Seyfer's libel and slander have also harmed Walker's ability to sell tools and equipment to automotive professionals. In addition to retail sales, Walker facilitates group buys, where customers pay deposits to secure tools and equipment at

19

a reduced cost. This aspect of Walker's business necessarily relies heavily on the customer's trust in sending substantial payments to him. That trust has been significantly undermined by Seyfer's malicious words.

68.     Seyfer's statements that Walker is "untrustworthy" and that he "steals software for a living" have also severely hindered Walker's ability to grow his product, ECUHero. The false accusations have had a detrimental impact on that product's development, as potential collaborators and employees understandably fear being associated with purported criminal activity and risk being labeled as untrustworthy themselves or as alleged co-conspirators with a thief, as Seyfer portrayed Walker.

69.     Seyfer's defamation also placed Walker at a distinct disadvantage when negotiating deals with potential collaborators in ECUHero, as well as tool and equipment vendors, as it weakens Walker's bargaining power in the future.

70.     Seyfer's libel and slander also appear to have had a significant impact on Walker's ability to secure contracts with companies for training services. Companies may understandably hesitate to hire Walker out of fear that their own reputation could be damaged by association with someone portrayed as a criminal by Seyfer and NASTF.

71.     Seyfer's statements have also had a negative effect on Walker's ability to participate as a sponsor of trade shows. These events, often hosted by other trade associations within the industry, are essential to maintaining industry relationships. Seyfer's actions have logically prompted these associations to view Walker's sponsorship unfavorably, consequently hindering Walker's ability to market his

20

product, ECUHero, as well as other tools and equipment, and to participate in trade shows where he can sell these products directly to customers.

## V. CLAIMS FOR RELIEF

### COUNT ONE

### LIBEL/DEFAMATION

### (Against Donald Seyfer)

72. Plaintiff re-alleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint.

73. At the 2024 Supplier & Training Expo ("STX"), held at the Gaylord Opryland Hotel in Nashville, Tennessee, from April 24-28, 2024, NASTF held its Fall General Meeting.

74. On or about the morning of April 24, 2024, Seyfer was making a presentation to between 100-150 attendees at the NASTF Fall General Meeting. During the Q&A segment that followed Seyfer's presentation, Walker asked Seyfer a question about the security of proposed transactions:

> . . . . To touch on what Mike said, (inaudible), one of the things is the sanctity of those LSID transactions right. And there's nothing really there to protect, right, there not encrypted, those messages are not encrypted, they don't use a kernel that encrypts that or anything. I mean, that can basically mean. I can take my Cardaq Device I can go program a vehicle.

75. At this point, Seyfer interrupted Walker and said:

> "JK, I don't wanna have this discussion. You know why I don't wanna have it with you? Because I'm not gonna tell you how we fixed that. I will not tell you how to do it

21

because *you've demonstrated you're not trustworthy with that information.*"

76.     When Walker tried to defend himself and asked Seyfer to explain his statement to those who had heard the remark, Seyfer simply refused to respond:

> So let's call it done, you and I (inaudible) conversation, I'm not gonna tell you how we fixed that problem. So (inaudible) done.

77.     On April 25, 2024, an audio-video recording of Seyfer's remarks, including his statement that Walker was "untrustworthy" was published on the Facebook page of Stephan Eric Lambert (https://www.facebook.com/stephan.lambert.5), who, upon information and belief, is a NASTF VSP. The recording is 2:56:18 long. At about the 2:50:39 mark on the recording, Seyfer, who is seen sitting on the dais behind the speaker's lectern, begins to speak and utters the defamatory statement.

78.     As of the date underwritten, multiple Facebook subscribers have "Liked" the post and hundreds of others have likely viewed it. Yet, as of 8:35 p.m. on December 18, 2024, the recording still exists on Lambert's public Facebook account, available for anyone to view.

79.     The statement Seyfer made to the attendees at the Nashville NASTF Fall general Meeting concerning Walker was false. At no time had Walker, as Seyfer alleged, been untrustworthy with information Seyfer or NASTF had provided. The statement itself expressed a false statement of fact, and falsely implied a  knowledge of negative facts about Walker's trustworthiness and integrity. There was likewise no factual  basis to say that Walker was dishonest or could not be generally trusted.

22

Seyfer's statement about Walker was a complete fiction, crafted to seem credible and to cause maximum damage to Walker and his business.

80.     Seyfer made the above-described defamatory statement with actual malice – *i.e.*, with knowledge of its falsity, or, alternatively, with a reckless disregard for its falsity.

81.     Seyfer made the statement without privilege or justification.

82.     The above-described statement concerning Walker directly injured him by diminishing his reputation in his profession, trade, and/or business, which has a natural tendency to lessen his profits.

83.     The above-described statements convey a defamatory meaning. They harm Walker's reputation as to lower it.

84.     It was Seyfer's expectation and intent that the defamatory statement would injure Walker economically, including by lessening his profits.

85.     As a result of the publication of the false and defamatory statement with actual malice, Walker has suffered damages including but not limited to lost compensation and income and loss to reputation.

86.     Seyfer's words – Walker is not trustworthy – were naturally understood by those who saw and heard them in a way that defamed Walker because, frankly, they could not have been taken any other way than as an accusation that Walker was dishonest.

87.     In doing these acts, Seyfer intended to injure Walker and deprive him of the respect, confidence, and esteem peculiarly essential to Walker's profession, and

23

contrived and intended to deprive Walker of his good name, reputation, and the esteem of clients and to bring the Walker into scandal, ridicule, and professional disrepute before clients, professional associates, friends, neighbors, and acquaintances, and the public in general, and to hold Walker up to public scorn, contempt, ridicule, and disgrace.

88.     As a direct and proximate result of the wrongful acts of the Defendants, Walker was injured in his good name and reputation and was caused to be humiliated and embarrassed and brought into public scandal and disgrace. Walker was caused to suffer great mental pain and anguish and was injured and damaged in his personal, social, official, and business relations.

89.     As a result of Seyfer's defamation, Walker has suffered general damages to his reputation.

90.     As a further proximate result of Seyfer's defamation, Walker has suffered special damages in that he has suffered an injury to his property, business, trade, profession, or occupation, all to his injury, in an amount to proven at trial.

COUNT TWO

SLANDER/DEFAMATION

(Against Donald Seyfer)

91.     Plaintiff re-alleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint.

92.     On or about November 5-7, 2024, at the Specialty Equipment Market Association ("SEMA") and Automotive Aftermarket Products Expo ("AAPEX") shows

24

in Las Vegas, Nevada, Seyfer stated to a group of attendees that Walker *"steals software for a living."* At the moment Seyfer made the false statement, he was speaking to a group that included a NASTF software developer and others whose names are not known to Walker. Numerous prominent figures in the automotive industry were lingering nearby as the room had been at full capacity moments earlier.

93.    Like Seyfer's statement months earlier in Nashville, Tennessee to a group of STX trade show attendees that Walker was *"not trustworthy,"* these words – "[Walker] *steals software for a living"* were false and defamatory and Seyfer knew they were false when he spoke them. They were spoken willfully and maliciously and with the clear intent to injure Walker's good name and reputation.

94.    The statement was, in fact, simply the latest act by Seyfer in his almost year-long smear campaign against Walker to undermine Walker's credibility and reputation, both in retribution for Walker's criticism of NASTF and Seyfer, and as a way to counter Walker's criticism.

95.    Walker does not, in fact, "steal software for a living." Walker designed and developed automotive software – ECUHero – to provide solutions for programming new and used modules in vehicles. An ECU, or Electronic Control Unit, is a device that controls various subsystems in a vehicle, such as the fuel injection and ignition systems. It is also known as an engine control unit or engine management system. ECUHero's software is designed to reflash and is intended to be intuitive, affordable, and easy to use for Fiat and Chrysler automobiles. Walker has never been "charged" with, much less convicted of, software theft.

25

96.     Seyfer's words carried a defamatory meaning because anyone who heard them would believe Walker was not only dishonest, but also a criminal, a thief, and someone who could not be trusted in business relations. After all, in Tennessee, theft of property could constitute anything from a Class A misdemeanor to a Class B felony and carry a penalty of a minimum of eight years and a maximum of 30 years imprisonment, plus a fine of up to $25,000.

97.     Seyfer's words were naturally understood by those who saw and heard them in a way that defamed Walker because, frankly, they could not have been taken any other way than as an accusation that Walker was dishonest, a criminal, and a thief.

98.     In doing these acts, Seyfer intended to injure Walker and deprive him of the respect, confidence, and esteem peculiarly essential to Walker's profession, and contrived and intended to deprive Walker of his good name, reputation, and the esteem of clients and to bring the Walker into scandal, ridicule, and professional disrepute before clients, professional associates, friends, neighbors, and acquaintances, and the public in general, and to hold Walker up to public scorn, contempt, ridicule, and disgrace.

99.     As a direct and proximate result of the wrongful acts of the Defendants, Walker was injured in his good name and reputation and was caused to be humiliated and embarrassed and brought into public scandal and disgrace. Walker was caused to suffer great mental pain and anguish and was injured and damaged in his personal, social, official, and business relations.

26

100.    As a result of Seyfer's defamation, Walker has suffered general damages to his reputation.

101.    As a further proximate result of Seyfer's defamation, Walker has suffered special damages in that he has suffered an injury to his property, business, trade, profession, or occupation, all to his injury, in an amount to proven at trial.

COUNT THREE

INTENTIONAL/RECKLESS INFLICTION OF EMOTIONAL DISTRESS

(Against Donald Seyfer)

102.    Plaintiff re-alleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint.

103.    The statements made by Seyfer, that Walker is *"not trustworthy"* and *"steals software for a living,"* were made with malice and/or oppression in that Seyfer knew or should have known that his words were false, yet acted intentionally or recklessly in disregarding the truth. Accordingly, an award of punitive damages is justified.

104.    Seyfer was motivated to retaliate against Walker for Walker's criticism of NASTF's unfair policies and Seyfer's leadership role in adopting those policies.

105.    The actions alleged above against Seyfer and NASTF were scandalous, outrageous, and utterly intolerable in a civilized society, and were done intentionally or with a reckless disregard of the probability of causing emotional distress to Walker.

106.    Seyfer knew, or should have known, that his conduct, described above, would result in severe mental anguish and distress to Walker, and that his conduct

27

was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, such severe mental anguish upon Walker. As a result of Seyfer's outrageous actions, Walker has suffered stress and anxiety, depression, insomnia, difficulty concentrating, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry.

107.   The wrongful acts of Seyfer and NASTF were willful, oppressive, intentional and malicious; therefore, punitive damages should be assessed against them in an amount deemed sufficient to punish and deter them and others in similar positions of authority from engaging in similar conduct in the future.

108.   The aforementioned acts were done knowingly, intentionally, and maliciously, for the purpose of oppression and inflicting injury upon Walker, and in reckless, wanton and callous disregard of the truth or falsity of Seyfer's statement.

COUNT FOUR

RESPONDEAT SUPERIOR

(Against National Automotive Service Task Force)

109.   Plaintiff re-alleges and incorporates each allegation set forth in the preceding paragraphs of this Complaint.

110.   The above-mentioned acts of defamation by Seyfer are a direct and proximate cause of the injuries sustained by Walker, and the injuries that have resulted therefrom.

111.   The defamation of Seyfer is imputed to the Defendant, National Automotive Service Task Force, by the doctrine of respondeat superior. At the time of

28

the defamation hereinabove described and immediately prior thereto, Seyfer was attending a trade show and NASTF meeting in Las Vegas and acting in his capacity as Executive Officer of NASTF. He was doing so with NASTF's consent and knowledge and under the authority granted by NASTF.

112. Specifically, Seyfer was an employee of NASTF, and was acting in the course of and within the scope of his employment and in the furtherance of the business of NASTF, at the time he committed the defamatory acts which proximately caused Walker's injuries. Therefore, the Defendants are jointly and severally liable to Walker for all damages proximately caused by the above-described defamation.

113. The malicious conduct of Defendant Seyfer is likewise imputed to NASTF by the doctrine of respondeat superior, for the reason that at the time of the defamation and immediately prior thereto, Seyfer was acting in the course and scope of his employment as NASTF's Executive Officer and with NASTF's knowledge and consent and under the authority granted by NASTF. Accordingly, Walker is entitled to recover punitive damages jointly and severally from the Defendants.

## VI.  JURY DEMANDED

114. Plaintiff demands a trial by jury of twelve.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.    That Defendants be served with a copy of this Complaint and be required to answer;

B.     That the Court find that the Defendants are liable to Plaintiff for slander, jointly and severally, for a sum to exceed $75,000 for compensatory damages;

C.     That the Court find that the Defendants are liable for intentionally inflicting emotional distress on the Plaintiff, as alleged herein;

D.     That Plaintiff be awarded punitive damages in the sum of Five Hundred Thousand Dollars ($500,000.00), or such other amount sufficient to deter Defendants from engaging in similar conduct in the future;

E.     That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

F.     That Plaintiff be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 30th day of December, 2024.


THE BAKER LAW FIRM


*/s/ Lance K. Baker*
Lance K. Baker, Esq.
Tenn. Bar #: 032945
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

*Counsel for the Plaintiff,*
*Jerry "JK" Walker*

30